JOEL C. KOURY
Attorney at Law #143856
3435 Ocean Park Blvd., Suite 107-50
Santa Monica, California 90405
(424) 248-8670
(866) 829-9412 (Fax)
Email Address: jckoury@aol.com

Attorney for Defendant
Felicia Muhammad

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>  v.<br><br>FELECIA MUHAMMAD,<br><br>  Defendant(s). | Case No: CR 14-0448-MWF<br><br>DEFENDANT FELECIA MUHAMMAD'S SENTENCING MEMORANDUM; POINTS AND AUTHORITIES IN SUPPORT THEREOF<br><br>Date: October 3, 2016<br>Time: 2:30 P.M.<br>Place: Courtroom 1600<br><br>HONORABLE MICHAEL W. FITZGERALD |

TO THE HONORABLE MICHAEL W. FITZGERALD, UNITED STATES DISTRICT COURT JUDGE, AND EILEEN DECKER, UNITED STATES ATTORNEY FOR THE CENTRAL DISTRICT OF CALIFORNIA AND/OR HER AUTHORIZED REPRESENTATIVES:

PLEASE TAKE NOTICE that on October 3, 2015, at 2:30 P.M., or as soon thereafter as the matter may be heard, in Courtroom 1600 of the above-entitled court, the defendant, Felicia Muhammad (hereafter "Ms. Muhammad"), hereby submits her

Position regarding Sentencing and Objections to the Presentence Report and Recommendation.

      This pleading is based on this notice, the points and authorities in support thereof, the pleadings and other papers in the court file, and on such other oral and documentary evidence that may be presented at the hearing. Ms. Muhammad reserves the right to supplement her sentencing position and arguments up to and including the day of the sentencing.

Dated:  September 22, 2016        Respectfully submitted,

                                            _____/s/_____
                                            JOEL C. KOURY
                                            Attorney for Defendant
                                            FELICIA MUHAMMAD

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

Because of the unusual circumstances involving Ms. Muhammad's limited participation in this offense and the mitigating events that preceded and let her to participate in the commission of this crime and the fact that she has no prior criminal conviction and never participated in any similar conduct, Ms. Muhammad would request a variance from the applicable advisory guideline sentence. Ms. Muhammad would request that the Court sentence her to sixty months of probation with six months of home confinement, a mandatory special assessment of $100, no fine since she has no realistic means of paying a fine, and restitution of $18,000 which represents the amount that she profited from her participation in this scheme.

This sentence represents a reasonable and fair sentence that is sufficient but not greater than necessary to achieve all of the goals of sentencing while taking into account the specific individual circumstances and characteristics of this defendant as she stands before the Court. Ms. Muhammad would request this sentence for the reasons states in this sentencing memorandum, pursuant to Title 18, United States Code ("U.S.C.") section 3553(a).[1]

//
//
//
//
//

---

[1] Ms. Muhammad also relies on *United States v. Booker*, 543 U.S. 220 [125 S.Ct. 738, 160 L.Ed.2d 621] (2005), *Rita v. United States*, 551 U.S. 338 [127 S.Ct. 2456, 168 L.Ed. 203] (2007), *Gall v. United States*, 552 U.S. 38 [128 S.Ct. 586, 169 L.Ed.2d 445] (2007), and *Nelson v. United States*, 555 U.S. 350 [129 S.Ct. 890, 172 L.Ed.2d 719] (2009).

## II.

## OBJECTIONS TO THE PROBATION DEPARTMENT'S GUIDELINE CALCULATIONS.

A. <u>Objection to Paragraphs 33.</u>

The defense concurs with most of the conclusions made by the Probation Department in that they concluded that it was the "developers/sellers of the condominium units, the real estate agent and investors who recruited straw buyers such as Ms. Muhammad to execute loan documents with false information. ... "it is not shown that she participated in planning or organizing the scheme. Further, the degree to which Ms. Muhammad exercised or influenced decision-making authority has not been has established, nor has Ms. Muhammad's responsibility and discretion in performing the scheme been established." Finally, it appears that Ms. Muhammad benefitted very little compared to the scope of the losses involved." See the Probation Report ¶ 33. (Hereafter PR.)

Where the defense disagrees with the Probation Department's conclusion is where they state "Muhammad may have had some degree of understanding of the scope and structure of criminal activity." The evidence at trial was that she like others before her were straw buyers while Olgun, Mansfield and others were the parties that planned, organized, recruited and substantially profited from this enterprise. PR. ¶ 33

Because of her limited involvement, Ms. Muhammad would move this court to depart four levels for her minimal role in the current offense. Ms. Muhammad relies upon section 3B1.2 of the Sentencing Guidelines, which allows a court to depart downward if it determines that a defendant was a minor participant in the criminal activity. <u>United States v. Hill</u>, 953 F.2d 452, 461 (9th Cir. 1991). Section 3B1.2 of the Guidelines "provides a range of adjustments for a defendant who plays a part in

committing the offense that makes him [or her] substantially less culpable than the average participant." Application Note 3(A).

In <u>United States v. Petti</u>, 973 F.2d 1441 (9th Cir. 1992), the Ninth Circuit affirmed the district court's finding that the defendant in that case was a minimal participant in a money laundering scheme. The court found that, "while a lack of knowledge could support a finding of minimal participation, something more than a complete absence of understanding *does not necessarily preclude* such a finding. Although the government list[ed] 'critical functions' Petti performed as a member of the conspiracy, it concede[d] that 'he was not involved in the actual 'smurfing' of the money into banks, or privy to all the mechanics of the laundering operation,' and that his role was 'subordinate' to Silberman's." <u>Id.</u> at 1447-1449. (Emphasis added.) The <u>Petti</u> court went on to state that, "the government has pointed to no evidence indicating the district court clearly erred in concluding Petti's role was minimal in comparison to that of his co-participants." <u>Id.</u>

In the commentary to Section 3B1.2 of the Guidelines at 3(A), it indicates that a defendant may receive and adjustment under this section and the example cited is "a defendant in a health care fraud scheme, whose participation in the scheme was limited to serving as a nominee owner and who received little personal gain relative to the loss amount …."

The court heard the evidence at trial and is familiar with the fact that this was large scheme run by multiple real estate builders, realtors, and investors and Ms. Muhammad had limited or no connection to most of them. While they were inflating the value of dozens of units at multiple locations, Ms. Muhammad, like other straw purchasers, were brought in to facilitate these three transactions at the instigation of Femi Olgun. Mr. Olgun was the person that transferred the illicit funds from his "real estate" trust to purchase the properties which in fact were funds that had been transferred to him by the property's builder. Mr. Olgun was the person that recruited Ms. Muhammad based on their prior relationship that included Mr. Olgun renting an apartment to Ms. Muhammad

and on a personal level. It was Mr. Olgun who instructed that the real estate documents be drafted by Allion Mansfield and others. Mr. Olgun was the person that had the properties transferred to his real estate trust within days after closing. It was Mr. Olgun and others that stood to gain if the market had not tanked. Ms. Muhammad criminal involvement was limited to signing the documents and verifying information contained in them.

While Mr. Olgun, the builders, investors made a six or seven figures profit in this transaction, Ms. Muhammad got $18,000 for her finite and limited participation.

As the probation department has correctly noted, her ability to exercise or influence decision-making or to exercise responsibility or discretion is known; it was non-existent, she was a pawn brought in to facilitate a real estate scheme that would slightly profit her while substantially profit everyone else around her which included not just the conspirators but also the bank employees and bank shareholders that had no problem with this sort of scheme while the market was soaring.

For all of these reasons, Ms. Muhammad would request a four level downward adjustment under Section 3B1.2 of the Guidelines.

B. <u>Objection to Paragraphs 38.</u>

The defense objects to the Probation Department decision to deny her a three level downward adjustment for Acceptance of Responsibility under Section 3E1.1 of the Guidelines. While the Probation Department does not explain the basis for their conclusion, the fact that Mr. Muhammad exercised her right to a trial in not a valid basis. *United States v. McKinney*, 15 F.3d 849 (9th Circuit, 1994).

In *Mckinney*, the Court held that a defendant that manifests genuine contrition for his acts but nonetheless contests his factual guilt at trial is still entitled to this reduction. In *McKinney*, the defendant elected to go to trial and did not put on a case relying almost exclusively on counsel's questioning during cross-examination. The also noted additional factors in the application notes from Section 3E1.1 that support the reduction:

1) voluntary and truthful admissions to authorities of involvement in the offense and related conduct, 2) voluntary assistance to authorities in recovery of fruits and instrumentalities of the offense, and 3) the timeliness of conduct manifesting acceptance.

In the current case, Ms. Muhammad never took the witness stand nor did she present any defense witnesses. Like in *McKinney*, her defense rested entirely on cross-examination by her counsel. Additionally, she met with law enforcement as far back as February 2, 2010 and again on November 22, 2010 and admitted to signing the occupancy certificates. PR ¶ 18 & 19(d). It was at that February 2, 2010 meeting with Long Beach Police Officers that she supplied them with loan applications that were used as exhibits in her jury trial by the government. PR ¶ 18. The fact that she struggled accepting moral responsibility for her poor judgment and accepting the criminal consequences that flow from a felony conviction does not diminish her acceptance that factual she participated in this crime nor does it detract from her statement to the probation officer about how this was the "this was the biggest mistake of her life. [she] did something she never should have done." PR ¶ 20. Ms. Muhammad would request that the Court reduce her offense level by three levels to recognize her acceptance of responsibility under Section 3E1.1.

C. Objection to the recommended request for $662,000 in restitution

Ms. Muhammad would object to the Probation Department's recommendation for an order of restitution in the amount of $662,000. PR ¶ 107. Clearly the Court has the power to order restitution in cases where the bank's poor management contributed to the loss. But the level of mismanagement in this case is truly extraordinary. A public library exercise more due diligence in checking out books than what we heard these banks exercised in approving these loans. At trial the Court heard testimony that Ms. Muhammad repeatedly questioned how she could be approved for a loan even with the false statements that she made in the application. For the bank to request $662,000

restitution for "losses" that resulted from their gross reckless behavior would be unfair relative to Ms. Muhammad's participation in this scheme.

A restitution order of $662,000 will result in a lifetime of punishment for Ms. Muhammad. At her age, she has already spent her lifetime working at positions that paid at or slightly above the minimum wage. Following this conviction, job opportunities will be even more limited. A restitution order of that magnitude means that her wages and public benefits that ordinarily would provide her with the most basic subsistence will be garnished for decades. An order of this magnitude will impact her and her daughter and will have a devastating impact relative to what she gained in participating in this conspiracy. The defense would therefore, request that Ms. Muhammad be ordered to pay the amount of restitution that she was responsible for which is $18,000.

D. <u>Adjusted Guideline Calculation.</u>

Based on the objections noted above, Ms. Muhammad would request that the Court adjuste offense level would be as follows:

    Base Offense Level:    7
    Offense Characteristics:    14
    Role Reduction:    -4
    Acceptance:    -3

Ms. Muhammad would request that the Total Adjusted Offense Level is therefore Fourteen (14). At a Criminal History Category of I, the advisory Guideline range is 15-21 months. For the reasons stated below, Ms. Muhammad would request a variance from this advisory sentence.

### III.

### MS. MUHAMMAD URGES THE COURT TO CONSIDER THE FOLLOWING FACTS APPLICABLE TO THE FACTORS ENUMERATED IN SECTION 3553(a)

Under <u>Gall v. United States</u>, 552 U.S. 38 [128 S.Ct. 586, 169 L.Ed.2d 445] (2007), the Supreme Court advised that in addition to considering the Guidelines, the "district court should … consider all of the 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [the court] may not presume that the Guidelines range is reasonable.  [The court] must make an individualized assessment based on the facts presented." <u>Gall</u> at 596-597.

Furthermore, "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" <u>Pepper v. United States</u>, 562 U.S. __ [131 S.Ct. 1229, 1239-1240] (March 2, 2011), quoting <u>Koon v. United States</u>, 518 U.S. 81, 113 (1996).  The Supreme Court has found that "[u]nderlying this tradition is the principle that 'the punishment should fit the offender and not merely the crime.'" <u>Id.</u> at 1240, quoting <u>Williams v. People of the State of New York</u>, 337 U.S. 241, 247 (1949).

Moreover, the Supreme Court has "emphasized that '[h]ighly relevant – if not essential – to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.' [Citation.] Permitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'" <u>Pepper</u>, 131 S.Ct. at 1240.  (Citations omitted.)

### A. Ms. Muhammad Urges the Court to Consider the Nature and Circumstances of the Offense and Ms. Muhammad's History and Characteristics Pursuant to Section 3553(a)(1)[2]

---

[2] To avoid repetitive accounts of his background history, Ms. Muhammad acknowledges that the probation officer's summary and account of his personal and family data, physical condition, mental and emotional health, substance abuse issues, educational and vocational skills, employment and financial data are mostly accurate (PSR ¶¶ 92-121).

SENTENCING MEMORANDUM – FELICIA MUHAMMAD

9

Ms. Muhammad had a difficult and troubled childhood. PR ¶ 50 – 62. Ms. Muhammad was regularly assaulted as young girl while she lived in the home of her mother and relatives. PR ¶ 54. Without a father Ms. Muhammad grew up at the mercy of a unstable mother until her death when Ms. Muhammad was only fourteen years old. PR ¶ 50.  Following her mother's death, Ms. Muhammad went to live with her abusive grandmother. PR ¶ 54. For most people events like these would require decades of counseling to help stabilize a person who has experienced this kind of horrific trauma. But Ms. Muhammad's family did not have the means or desire to allow her to get treatment.  It is not surprising that Ms. Muhammad's mental health issues continue today with "cycles of depression" and worse as an adult. PR ¶ 69.

And yet, Ms. Muhammad soldiers on, struggling with little or no familial support, to get her high school diploma as a young woman twenty years old. PR ¶ 74. And later attending community colleges to try and get a degree that would allow her to enter and remain in the middle class. PR ¶ 71,72, & 73.  She has worked at multiple jobs making slightly more than the minimum wage over the years but never getting the opportunity to find a job that could really become a career. PR ¶ 76-83.

In 2005 through 2008, it is not surprising that she like so many others before her would think that working in the real estate field would be the opportunity that had alluded her up to that point. Ms. Muhammad got her salesperson license in November 2005. PR ¶ 75 but as we heard during the trial, Ms. Muhammad never bought or sold a single home or property in her entire career. The Court is well aware that the booming real estate market during those years led whole sections of our country to make substantial profits including people like Mr. Mansfield. Many of those participants after the crash went from high paying jobs to working for minimum wage. Ms. Muhammad got her real estate license court hoping that she could break into that market, but as the Court heard at trial – she never bought or sold a single home.  This series of transactions set up and orchestrated by Mr. Olgun was the only time in her life that she ever filled out or closed a

real estate transaction. A real estate purchase, with the multiple transactions involved and the loan processing is complicated for people that have experienced it multiple times. For Ms. Muhammad all she really knew was that she would profit if she followed the direction of fast talking codefendant Mansfield and the con man Femi Olgun.

Ms. Muhammad, she was in a particularly vulnerable state having suffered through a series of traumatic events over the last few years. She had lost her business a few years earlier incurring significant debt, then she lost her best and closest friend when she was murdered and then the final straw came when she lost her job at Nordstroms. Ms. Muhammad prior to contacting Mr. Olgun was financially desperate and someone that could easily be convinced to participate in this scheme. PR ¶ 21, 82 & 84.

But it is not just Ms. Muhammad that will suffer with a lengthy custodial sentence. A custodial sentence will significantly impact Ms. Muhammad's daughter since it is Ms. Muhammad that pays the rent and provides the stability for the two of them. PR ¶ 62.

In assessing Ms. Muhammad's limited role in this conspiracy, the tragic events of her early life, the unusual financial strain that she was suffering, the impact on her daughter, and her lack of a criminal record - a felony conviction, that can never be removed, will have a significant impact on her for the rest of her life both in what kind of jobs she will be able get and even the kind of benefits that she will be eligible later in life if she finds her and her daughter struggling financially. A custodial sentence will result in her losing her apartment and most of her possessions. It will have a permanent debilitating impact that will take her most of her life to overcome, if she is ever able to overcome its impact.

The circuit court has given sentencing courts wide latitude in sentencing and found downward variances appropriate in similar cases. In *United States v. Whitehead*, 532 F. 3d 991 (9th Cir. 2008), the Ninth Circuit found that the district court did not abuse its

discretion when it imposed a sentence of probation, community service and restitution,[3] a downward variance from the calculated guideline range of 41 to 51 months, for the defendant's convictions on various federal laws. According to the Court of Appeals,

> "[a]t the sentencing hearing, the court heard from Whitehead and his father, who told the court how Whitehead repented his crime; how he had, since his conviction, devoted himself to his house-painting business and to building an honorable life; how his eight-year-old daughter depended on him; and how to doted on her. In addition, the court took into account its finding that Whitehead's crime '[d]id not pose the same danger to the community as many other crimes.' These are all considerations that the district court may properly take into account." *Id.* at 993.

### B. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and to Provide Just Punishment for the Offense and To Afford Adequate Deterrence to Criminal Conduct and Protect the Public from Further Crimes of the Defendant

A felony conviction will now permanently be part of Ms. Muhammad record. That conviction will preclude her from working in most customer service positions where she deals with money or credit card information. A felony conviction will preclude her from working as an Uber driver. The conviction when combined with sixty months of probation and six months of house arrest and a restitution order for $18,000 that will disgorge all of her ill gained profit will provide just punishment for this offense and certainly be a deterrent to anyone considering engaging in similar criminal behavior and is more than sufficient to comply with 18 U.S.C. Section 3553(a).

## IV.
## CONCLUSION

For all of the aforementioned reasons, Ms. Muhammad would request a sentence of sixty months of probation, six months of house arrest, no fine and restitution in the amount of $18,000.

---

[3] The district court imposed 1000 hours of community service, $50,000 restitution, and five years of supervised release.

September 22, 2016           Respectfully submitted,

                             _____/s/_____
                             JOEL C. KOURY
                             Attorney for Defendant
                             FELICIA MUHAMMAD